IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

G.J., a minor, ESTATE OF
LOGAN JOHNSRUD and ERIK
JOHNSRUD,

        Plaintiffs and
        Crossclaim Defendants,        OPINION AND ORDER

NORTH CENTRAL STATES REGIONAL        20-cv-108-wmc
COUNCIL OF CARPENTERS HEALTH FUND,

        Involuntary Plaintiff
        and Cross-Claimant,

    v.

WOOD COUNTY and NATHAN DEAN,

        Defendants.

On June 11, 2019, then Wood County Sheriff's Department Deputy Nathan Dean tragically shot Logan Johnsrud, Erik Johnsrud, and his fellow Deputy, Corey Leigh, while responding to a wellness check.[1]  Although Logan died as a result of this encounter, his minor son, his estate, and his brother Erik bring claims against Deputy Dean under 28 U.S.C. § 1983 for violations of their constitutional rights.  Presently before the court is defendants' motion for summary judgment (dkt. #35), which for the reasons that follow will be granted in part and denied in part.  Specifically, defendants' motion is granted as to Wood County and the claims of Logan's minor son and his brother Erik, but denied in all other respects.

---

[1] For ease of reference and to avoid confusion, the court will generally refer to the Johnsruds by their first names.

UNDISPUTED FACTS[2]

**A. Introduction of the Parties**

Plaintiff Erik Johnsrud lives in his home in Arpin, Wisconsin, and he is the younger brother of Logan Johnsrud, who died shortly after the shooting. As noted, Logan's estate is also a plaintiff in this action, along with Logan's two-year-old son, G.J., who asserts a claim for loss of society.

Defendant Nathan Dean is currently a sergeant with the Wood County Sheriff's Department, having been promoted to that position in October 2020. While now employed with the Department for approximately seven years, for all times relevant to this complaint, Dean was a "Patrol Deputy" with the Sheriff's Department. Wood County is also named as a defendant but only for indemnification purposes as discussed below.

**B. Events of June 11, 2019**

**1. Initial Interaction**

On June 11, 2019, at 3:45 p.m., Wood County authorities received an emergency call regarding Logan Johnsrud, who was seen walking shoeless along a highway. At that time, Logan was stopped but not detained after explaining to officers that he was walking home. Some time later that day, Erik also received a phone call from a friend, who told Erik that he saw Logan interacting with law enforcement after walking along County Highway N, close to Arpin, wearing only shorts, covered in mud, and with cuts on his body.

---

[2] Unless otherwise noted, the following facts are material, undisputed and viewed in the light most favorable to plaintiffs as the non-moving party.

Later that evening, an older gentleman dropped off Logan at Erik's house. Logan and Erik sat outside talking, during which Logan was upset and expressed disappointment in himself for relapsing. After Erik asked what he could to do to help, Logan responded something to the effect that "he could give him a rope and a goodbye hug." At this point, Erik made an excuse to go inside his house and called Wood County's non-emergency line seeking help for his brother. That call was placed approximately 15 to 20 minutes after Logan arrived at the house, and Erik told the dispatcher that he believed Logan was suicidal. Erik also asked the dispatcher to send officers without lights and sirens for fear that Logan would "get freaked out and try and run away." (Defs.' PFOFs (dkt. #37) ¶ 16 (citing Johnsrud Dep. (dkt. #31) 60).)

In response to Erik's call, Deputy Dean, who was then on the south end of Marshfield, Wisconsin, was dispatched to the house for a welfare check on Logan. While en route, Dean spoke with his partner, Deputy Cory Leigh, also a patrol deputy, who had been employed with the Wood County Sheriff's Department since June 2006, and was also heading to Erik's residence. During that call, Leigh advised Dean that a patrol unit had been in contact with Logan earlier that day while he was "walking along a road with only shorts on, no shirt or shoes." (Def.'s PFOFs (dkt. #31) ¶ 36.) However, Dean received no indication that during this earlier contact Logan posed any threat to the responding officers, and Dean understood that Logan was not a suspect for any crime. Instead, both officers understood they were called to the scene to perform a welfare check. From his training, Dean further knew that his job on the scene was to try and save Logan's life.

Dean arrived at Erik's house first around 7:53 p.m., with Leigh arriving a couple of minutes later. Both deputies wore body-worn cameras that were active and recorded the entirety of the relevant events following their arrival at Erik's home. (Dkt. ##39-1, 40-1.) The video recordings initially show both deputies speaking to the Johnsrud brothers outside of Erik's home for approximately seven minutes, with Logan sitting and Erik standing. During this exchange, among other statements, Dean told Logan that the deputies were there because Erik contacted law enforcement out of concern for him. However, Logan claimed that Erik was "making shit up" and denied that he was suicidal. (Defs.' PFOFs (dkt. #37) ¶¶ 22, 24-25.)

At some point, Deputy Dean attempted to talk with Erik separate from Logan, but Logan followed, at which point Dean said, "You can stay with Deputy Leigh okay? . . . You're not talking, so I'm gonna go talk to your brother and get the straight story from him." (Pls.' PFOFs (dkt. #44) ¶ 54.) In response to Logan's statement that Erik had never been in trouble, Dean also stated, "I hate to say it but I think [I'm] going to believe him before I ever believe a word that comes out of your mouth today." (*Id.* ¶ 58.) After that, Dean and Logan had an exchange about Logan's son, prompting Dean to offer that "the family center" may work with him on visitation and custody issues, to which Logan responded, "such bull shit." (*Id.* ¶¶ 59-60.) At approximately 7:58 p.m., Dean indicated that if Logan did not want to talk, he would call the crisis center and let them know what was going on, so they could make a determination as to whether Logan should be placed in "emergency detention against your will." (*Id.* ¶ 61.) Erik testified at his deposition that he believed Dean was agitating Logan with his comments. (*Id.* ¶ 62 (citing Erik Johnsrud

Dep. (dkt. #31) 61-63).)[3]

After this initial exchange, Deputy Leigh sat down across from Logan at a table outside of the house and chatted with him in an effort to build rapport. Some four minutes later, Erik went into his house, and around 8:03 p.m., Dean went to his squad car to call the Wood County Crisis Intervention, which he did at 8:04 p.m. and spoke with Jamie Reimer about Logan for approximately eight minutes. During that conversation, Dean told Reimer that Logan was "very uncooperative" and "a frequent flyer with the sheriff's department . . . [who had] relaps[ed] on an unknown substance . . . [and] has been known to use meth in the past." (*Id.* ¶ 70.) After relaying this information to Reimer, she asked to speak to Logan directly, at which point Dean exited the squad car with his cell phone so that Reimer could speak to Logan, who was now standing by the picnic table near the back door of the house across from Leigh.

While Dean was on the phone with Riemer, Deputy Leigh continued to speak with Logan, who at one point had offered Leigh a handshake and attempted to leave. Leigh took Logan's hand and shook it, but then told Logan, "[y]ou can't just walk away." (*Id.* ¶¶ 83-84.) Leigh further explained, "[w]e've gotta figure out what's going on, okay? I don't want to be a dick or anything about it, but you can't leave. Alright?" (*Id.* ¶ 86.) Leigh also explained that he didn't want to restrain Logan. Logan cooperated and then stood with Leigh by the back door for approximately four minutes.

---

[3] To the extent plaintiffs intend to rely on these facts at trial to argue that Dean unreasonably created an encounter that lead to his use of force, the court is highly skeptical of this argument. *See Williams v. Ind. State Police Dept.*, 797 F.3d 468, 483 (2015). Nonetheless, pre-seizure conduct is relevant to assessing the reasonableness of a seizure in light of the totality of the circumstances, *see id.*, so the court sets forth these proposed findings.

## 2. Shooting

At approximately 8:12 p.m., when Dean exited the police cruiser and approached Logan and Leigh, rather than offer his cellphone to Logan, he began to explain to Logan what the next steps would be.  In particular, Dean said, "Alright Logan, so here's the deal. Based on the information that we received from your brother, whether you think it's true . . . ."  (*Id.* ¶ 93.)  At that moment, Logan turned, ran into the house, and locked the door behind him.  Logan then went into the kitchen, scoured through Erik's silverware drawer, grabbed a knife, and held it to his wrist.  In response, Leigh broke into the backdoor and went inside, where he found Erik bear-hugging Logan from behind, and Logan with a knife in his hand.  Leigh believed that Logan had grabbed the knife because he was suicidal, and he tried to help Erik get the knife away from Logan.

Believing that Logan was going to run through the house and exit through the front door, Dean separated as Leigh entered the backdoor, and he ran around to the front of the house.  As he was running, however, Dean saw through the kitchen window what appeared to be a physical struggle involving Leigh, prompting him to turn around and run back to the broken door where Logan and Leigh had entered.  As he initially entered the house, Erik and Logan were in the kitchen, and Dean did not yet have his gun in the hand.  At this point, the parties dispute the exact location of the brothers in the kitchen as Dean entered through the door, including:  whether they were in the middle of the kitchen or on its right-side; whether Erik was behind Logan; what Erik's position was vis-à-vis Logan, as well as what their subsequent movements were; and whether they advanced across the kitchen, closer to Dean.  Regardless, the following screen shots from the video depict the

first second after Dean's entrance through the back door, facing the kitchen:



(Pls.' PFOFs (dkt. #44) ¶ 110.)



(Defs.' PFOFs (dkt. #37) ¶ 44.)

Visible on the video, through less so in these screen shots, is a kitchen knife in Logan's right hand and Erik wrapping his right arm around Logan's neck, while his left hand is attempting to grab Logan's left wrist. Seeing Logan with the knife and struggling with Erik, Deputy Dean then drew his service weapon and shouted, "Drop it dude, drop it, drop." The following screen shot captures this moment.



(*Id.* ¶ 49.) Although Leigh is by this point visible to the right of the struggling brothers, Dean testified at his deposition that he "did not know where my partner was at the time," which is understandable if he were struggling with tunnel vision. (Defs.' PFOFs (dkt. #37) ¶ 48 (citing Dean Dep. (dkt. #29) 87).) At the same time, Erik is next to Logan and now reaching across the entire front of his body with his left arm in an attempt to reach Logan's right arm, which is completely outstretched and holding the knife over the kitchen counter.

In that same second, the video next shows Logan's right elbow bend, raising the knife toward the ceiling, as depicted in the following screen shot.



(*Id.* ¶ 53.) Deputy Dean then brings his left hand to his gun, as depicted below. Although the parties dispute whether Logan is moving toward Dean in this moment, (*id.* ¶ 56), there is no dispute, that Dean was approximately 10 to 15 feet from Logan at the time the shots were fired.



The next screen shot depicts the moment Dean fired his first shot, as shown by his service weapon's muzzle's flash.



(*Id.* ¶ 58.) Dean's body camera footage then indicates that he fired three rounds in the span of approximately one second.[4] Deputy Leigh was struck in the arm by one of the rounds; Erik was struck in the finger by one of the rounds; and Logan was fatally wounded by one of the rounds. From the time Dean entered the house to the time the shots were fired, approximately five second elapsed in total.

In the seconds leading up to the shooting, while Erik and Logan were struggling, Deputy Leigh made a decision to deploy his Taser, believing he could use it to save Logan's life. Unfortunately, Leigh was unable to unholster his Taser as reflected in the video where

---

[4] Plaintiffs contend that the audio and video are not perfectly synchronized, and from this contend that Logan's body is already falling forward, with the knife at his side, when the first shot is actually heard on the body camera. (Pls.' PFOFs (dkt. #40) ¶¶ 145-46.) Among others, the court addresses this assertion below.

Leigh is looking down and trying to unfasten the Velcro from his Taster holster. Before focusing on unholstering his Taser, Leigh testified that he saw Erik "bear-hugging [Logan] from behind, and then saw them moving their way to the door." (Defs.' PFOFs (dkt. #37) ¶ 66 (quoting Leigh Dep. (dkt. #30) 27).) Again, the parties dispute whether Leigh's body camera video actually shows the Johnsrud brothers moving in the direction of the back door where Dean was located in the last two seconds before the shooting. However, from Deputy Leigh's perspective, Logan never demonstrated an intent to injure anyone other than himself, and he never attacked or attempted to attack anyone while inside the house.

## C. Defendant Dean's Explanation

During his deposition, Deputy Dean testified that he fired his weapon because he believed there was "imminent danger of death or great bodily harm to both myself, possibly my partner inside that house and Erik." (Defs.' PFOFs (dkt. #37) ¶ 73 (quoting Dean Depo. (dkt. #29) 87).) Plaintiffs do not dispute that this was Dean's testimony, nor could they, but plaintiffs challenge its accuracy based on the fact that Dean: (1) did not mention the threat to himself, Deputy Leigh *or* Erik when he described what happened to his supervisor on the day of the shooting (Pls.' PFOFs (dkt. #44) ¶¶ 162-66); and (2) testified at his deposition that Logan had only threatened himself before he made the decision to shoot (*id.* ¶ 122). In response to the latter point, defendants contend that after reading his deposition testimony in context, Dean meant to testify that Logan never *verbally* threatened anyone before his decision to use his weapon. (Defs.' Resp. to Pls.' PFOFs (dkt. #50) ¶ 122.)

Specifically, Dean testified at his deposition that once

> inside the house, [Logan] armed himself with a knife.  I don't
> know where my partner, Deputy Cory Leigh, was at that time,
> I don't know if he had been harmed.  And then as he continued
> to move towards me with the knife is then when I felt the
> imminent threat of death or great bodily harm to myself.

(Defs.' PFOFs (dkt. #37) ¶ 75 (quoting Dean Dep. (dkt. #29) 103).)  Dean further

explained that from his view, "Logan had a knife in his right hand, [and] continued to

progress towards me closing the distance."  (*Id.* ¶ 76 (quoting Dean Dep. (dkt. #29) 114-

15).)  Dean further believes with the benefit of hindsight that he was experiencing "tunnel

vision," because he did not see Deputy Leigh in the kitchen.  (*Id.* ¶ 77 (quoting Dean Dep.

(dkt. #29) 111-12).)  Defendants' expert, Dr. John Peters, also explains in his report that

"tunnel vision" is "a loss of peripheral vision where one's field of vision may narrow to

mere inches and you may lose your depth perception and your ability to see what is behind

the threat."  (*Id.* ¶ 78 (quoting Peters Rept. (dkt. #41-1) 14).)  Dr. Peters' report cites

studies indicating that tunnel vision is common with officers involved in critical incidents,

and anywhere from 42% to 79% of officers involved in shootings reported experiencing

tunnel vision.  (*Id.* ¶ 80 (citing Peters Rept. (dkt. #41-1) 14-15).)  At his deposition, even

plaintiffs' expert, Roger Clark, testified that "[t]unnel vision exists" and is "part of a . . .

panic response or panic condition, flight-fight condition" that may be "expressed a number

of ways," but also testified that properly trained officers know how to respond to, and

accommodate for, tunnel vision in order to protect health and safety.  (*Id.* ¶ 81 (citing

Clark Dep. (dkt. #33) 86-87, 104-07).)

　　　　Finally, Dean testified at his deposition that he did not intend to shoot Erik or

Leigh.  While plaintiffs purport to dispute this, apparently on the basis that Dean was

trained to use his weapon and was specifically trained to not shoot unless his specific target

was isolated, Dean testified that his "target isolation and [his] sights [were on] Logan and

Logan only." Based on his training, Dean also believed he would "be able to isolate Logan

and stop the threat without anyone else getting hurt." (*Id.* ¶¶ 84-85 (quoting Dean Dep.

(Dkt. #29) 104-05, 147).)[5]


OPINION

The court takes up each plaintiffs' Fourth Amendment claim against Deputy Dean

in the opinion below, but as an initial matter, defendants point out that Wood County

does not appear to be a proper defendant at all given the absence of any claims under

*Monell v. Department of Social Services of New York City*, 436 U.S. 658 (1978). Instead,

plaintiffs appear to have simply named Wood County as a defendant for indemnification

purposes under Wisconsin Statute § 895.46, which defendants observe "'does not provide

a private cause of action for indemnification' against the County, but instead 'provides for

the [municipality] to pay the damages[if, any,] on behalf of' the public officer or

employee." (Defs.' Opening Br. (dkt. #36) 31 (quoting *Jackson v. Graves*, No. 14-cv-1206-

pp, 2015 WL 5577527, at *4 (E.D. Wis. Sept. 22, 2015)).) Since plaintiffs fail to respond

---

[5] Defendants include facts about Wood County's crisis intervention training ("CIT") and Dean's firearm training (Defs.' PFOFs (dkt. #37) ¶¶ 89-97), while plaintiffs similarly submit facts about Wood County's policy and training when dealing with a suicidal individual and use of force (Pls.' PFOFs (dkt. #44) ¶¶ 1-25), but none of this appears material to any of the claims at issue, especially given that plaintiffs do not assert any *Monell* claim against the County as addressed at the outset of the opinion above. To the extent some of these facts may show that Dean acted contrary to County policy in dealing with Logan or firing shots, these facts are still only marginally relevant to the claims at issue, particularly at summary judgment. *See Estate of Biegert by Biegert v. Molitor*, 968 F.3d 693, 699 (7th Cir. 2020) ("[Section] 1983 protects plaintiffs from constitutional violations, not violations of state laws or, . . . departmental regulations or police practices.").

to this argument in their opposition brief, the court will grant this part of defendants' motion for summary judgment and terminate Wood County as a defendant. Thus, the remaining discussion addresses plaintiffs' claims against defendant Dean only.

## I. Logan Johnsrud's Fourth Amendment Claim

"A police officer's use of deadly force constitutes a seizure within the meaning of the Fourth Amendment, and therefore it must be reasonable." *Scott v. Edinburg*, 346 F.3d 752, 755 (7th Cir. 2003). An officer's use of deadly force is generally found to be reasonable "if the officer, when exercising his or her reason and judgment, has probable cause to believe that the suspect poses a threat of death or serious physical harm to the officer or others and, whenever possible, warns the suspect before firing." *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988) (citing *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985)). Moreover, in reviewing an officer's decision to employ deadly force, what matters is not the officer's subjective beliefs or intentions, but the objective reasonableness of the officer's threat assessment and response. *Graham v. Connor*, 490 U.S. 386, 388, 396-99 (1989). As the Supreme Court explained in *Graham*:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396-97 (internal citations omitted). For this reason, the determination of whether an officer's use of force is "reasonable" tends to be highly context-specific, requiring a full

consideration of and appreciation for the totality of the circumstances.  *Id.*; *Garner*, 471 U.S. at 8-9.

Defendants argue that Dean's exercise of deadly force before Logan was free from Erik's embrace and had full control of the knife does not by itself render his firing unreasonable, citing to *Henning v. O'Leary*, 477 F.3d 492, 496 (7th Cir. 2007).  (Defs.' Opening Br. (dkt. #36) 7-8.)  In *Henning*, the court affirmed a grant of summary judgment to defendants on plaintiffs' excessive force claim, finding that plaintiffs failed to offer any real evidence to contradict the officers' account of the shooting -- in particular, that Henning's hands were on or near a gun that had fallen out of an officer's holster.  *Id.* at 494, 496.  The facts in this case are readily distinguishable from those in *Henning* in at least two, material respects.  First, plaintiffs here not only provide a different version of the moments leading up to the shotting than defendant, but arguably so do Deputy Leigh and a credible interpretation of the video, which appears to show Erik still with a bear hug around Logan and attempting to control his right arm, as well as Logan still 10 to 15 feet away from Dean when he began shooting.  Second, in *Henning*, the gun was in or near the suspect's hand with the barrel facing the officer, while Logan was holding a kitchen knife some 10 to 15 feet away from Deputy Dean at the time he fired his gun.

In another case cited by defendants, *King v. Hendricks County Commissioners*, 954 F.3d 981 (7th Cir. 2020), the plaintiff was running at the officer with a knife in his hand, pointed at the officer, while the officer backpedaled away from him.  At the time, the officer shot the plaintiff, he was already approximately eight feet away from him and closing fast.  Again, even if the jury were to credit that Logan was moving toward the back door, closer

to Dean, he was not running at Dean with the knife thrust toward him. Finally, with respect to *Estate of Biegert by Biegert v. Molitor,* 968 F.3d 693 (7th Cir. 2020), in which defendant point out that the Seventh Circuit affirmed summary judgment in the defendant's favor because undisputed facts established that the plaintiff got into a physical scuffle with officers and actually stabbed an officer with a kitchen knife before being shot, the same distinction in impending risk of death or severe bodily harm exists. Indeed, the *Biegert* court emphasized that "someone does not pose an immediate threat of serious harm solely because he is armed." *Biegert,* 968 F.3d at 700 (citing *Weinmann v. McClone,* 787 F.3d 444, 447 (7th Cir. 2015), as an illustration). In other words, "[h]aving a weapon is not the same as threatening to *use* a weapon." *Id.* (emphasis added). Thus, unlike here, the plaintiff in *Biegert* had actually used the weapon by stabbing one of the officers multiple times before being shot. *Id.*

Defendants also emphasize Dean's testimony about experiencing tunnel vision and believing that Logan posed an imminent threat to Officer Leigh or him. (Defs.' Opening Br. (dkt. #36) 10, 15.) However, even if Dean subjectively felt that his or others' lives were in danger, the test is whether a reasonable officer would have concluded that lethal force was warranted in light of the threat that Logan then posed.[6] *See Weinman v. McClone,*

---

[6] For these same reasons, the court is unconvinced by plaintiffs' attempt to portray as dispositive a snippet from Dean's deposition testimony in which he responded, "Yes" to the question, "And so before you pulled the trigger at Logan, Logan had as far as you know only threatened himself, correct?" (Pls.' Opp'n (dkt. #42) 27 (citing Dean Dep. (dkt. #29) 102).) Even if Dean's subjective belief as to the threat Logan posed were material, it is certainly not dispositive. Plus, the court agrees that this "gotcha" attempt appears to take Dean's testimony out of context, in which he seems to be referring to *verbal* threats or at least Dean's counsel may so argue to the jury. (*See* Dean Dep. (dkt. #30) 103 (describing "initial conversation" with Logan during which he made "comments . . . that he wanted to harm himself").)

787 F.3d 444, 449 (7th Cir. 2015) ("It does not matter for purposes of the Fourth Amendment that McClone subjectively believed that his life was in danger."); *Est. of DiPiazza v. City of Madison*, No. 16-CV-060-WMC, 2017 WL 1337313, at *7 (W.D. Wis. Apr. 11, 2017) ("[W]hat matters is not the officer's subjective beliefs or intentions, but the objective reasonableness of the officer's threat assessment and response.") (citing *Graham*, 490 U.S. at 388, 396-99).

Implicit in defendants' motion also is the belief that the video from the officers' camcorders forecloses any fact issues and supports a finding of summary judgment in their favor. As the Seventh Circuit recently explained in *Hurt v. Wise*, 880 F.3d 831 (7th Cir. 2018), however, the Supreme Court in *Scott v. Harris*, 550 U.S. 372 (2007), did "not treat video footage as a distinct type of evidence that is not subject to the normal summary judgment strictures." *Id.* at 840. Instead, the parties offer different, arguable characterizations of the video, which, as plaintiffs note, is the "essence of fact disputes." (Pls.' Opp'n (dkt. #42) 14 (citing *Jackson v. Curry*, 888 F.3d 259, 264 (7th Cir. 2018)).) No doubt, the video will be helpful to the jury in resolving this case, but fact issues remain as to whether an objective officer would have reasonably perceived Logan as an imminent threat. In particular, among others, plaintiffs have raised a genuine issue of material fact as to whether: (1) Logan was moving toward Dean at the time he was shot; (2) Logan raised or otherwise directed the knife in his or another's direction; and (3) Erik had sufficient control over Logan to mitigate any reasonable threat he may have otherwise posed to Erik or the officers.

In the alternative, Dean seeks judgment in his favor on qualified immunity grounds. The "doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (*per curiam*) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). A qualified immunity defense has two prongs: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017) (quoting *Allin v. City of Springfield*, 845 F.3d 858, 862 (7th Cir. 2016)). "[C]ourts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Pearson*, 555 U.S. at 236).

"A clearly established right is one that is sufficiently clear that every reasonable official would understand that what he is doing violates that right." *Mullenix*, 577 U.S. at 11 (internal citations and quotations omitted). While "a case directly on point" is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741. In support of his motion, Dean argues that *King* and *Biebert* -- cases decided after the use of force at issue here -- show that the use of force did not violate clearly established law. (Defs.' Opening Br. (dkt. #36) 26.) It's an odd argument since defendants are attempting to show that any right to be free from the use of deadly force was not clearly established at the time of the shooting by pointing to cases that post-date the incident here, particularly since those decisions affirmed that right,

albeit not under the specific use of force facts in those cases. Regardless, for the reasons already discussed above, the court finds the facts at issue in *King* and *Biegert* are readily distinguishable, and, therefore, these cases do not *require* the application of qualified immunity.

To meet their burden, plaintiffs direct the court to *Weinmann v. McClone*, 787 F.3d 444 (7th Cir. 2015), and *Williams v. Indiana State Police Department*, 797 F.3d 468 (7th Cir. 2015). In *Weinmann,* the Seventh Circuit on interlocutory appeal from a denial of qualified immunity at summary judgment, affirmed the district court's finding that genuine issues of material facts precluded the application of the defense. 787 F.3d at 450-51. Specifically, the court concluded that viewing the facts in the light most favorable to the plaintiff, issues remained with respect to the actions of the defendant officer in response to an individual threatening suicide who had never pointed the gun at the officer. *Id.* at 447. More specifically, the Seventh Circuit concluded that the *Graham* and *Garner* cases "stand for the proposition that a person has a constitutional right not to be shot unless an officer reasonably believes that he poses a threat to the officer or someone else." *Id.* at 450. Moreover, the court also reviewed other court of appeals decisions holding that "officers may not use deadly force against suicidal people unless they threaten harm to others, including the officers." *Id.* Finally, the court concluded if the undisputed facts demonstrated that "Jerome had the gun raised to his shoulder and pointed at [Officer] McClone, then McClone would have been justified in using deadly force and hence entitled to qualified immunity." *Id.* at 449-50.

In *Williams*, the Seventh Circuit actually consolidated two appeals of excessive force claims, one in which the district court granted the officers' motion for summary judgment on qualified immunity grounds, and the other in which the district court denied the motion, affirming both. Both cases involved officers responding to suicidal threats, and both cases also involved the use of deadly force. 797 F.3d at 472. In the first case, the court concluded that the officers were entitled to qualified immunity in their use of lethal force because the plaintiff was "advancing towards them with a knife, and in fact one officer was ultimately stabbed." *Id.* at 480. In contrast, in the second case, the court concluded that factual disputes precluded the application of qualified immunity given the testimony of the plaintiff's mother, who disputed the officers' testimony that her son was ordered to drop his knife and that the officers warned him that they would kill him if he did not, finding that the testimony "created a genuine issue of fact as to whether John was in fact threatening the officers with a knife at the time he was shot." *Id.* at 482. In so holding, the Seventh Circuit implicitly found that an officer's use of lethal force against a suicidal individual in possession of a knife, but not threatening to use it against the officers or others would violate the Fourth Amendment.

For all the reasons provided above, therefore, there are at minimum genuine disputes of material fact as to whether Logan posed a threat to Dean, Erik or Officer Leigh that warranted a reasonable officer's use of lethal force. As such, the court denies defendants' motion on qualified immunity grounds.

## II. Erik Johnsrud's Fourth Amendment Claim

Defendants also seek summary judgment with respect to plaintiff Erik Johnsrud's

Fourth Amendment claim on the basis that he was not seized under the Fourth Amendment. Specifically, defendants rely on the holding in *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), in which the Supreme Court explained that

> a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent bystander), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a government termination of movement *through means intentionally applied*.

*Id.* at 844 (emphasis in original) (internal citation and quotation marks omitted).

More specifically, relying on the Supreme Court's language in *County of Sacramento*, the Seventh Circuit has concluded that the Fourth Amendment did not apply to a claim by an innocent bystander arising out of an officer's use of a tire-deflation device to stop a fleeing suspect, because it did not constitute a seizure. *Bublitz v. Cottey*, 327 F.3d 485, 487-89 (7th Cir. 2003). Even more specifically, in *Schaefer v. Goch*, 153 F.3d 793 (7th Cir. 1998), the Seventh Circuit concluded that officers did not violate the Fourth Amendment rights of the plaintiff, who officers "unintentionally shot" while attempting to apprehend her husband. *Id.* at 794. (*See also* Defs.' Opening Br. (dkt. #36) 19 (citing district court cases and decisions from other circuits for further support).)

In response, plaintiffs argue that the "facts allow the jury to infer that Erik was unlawfully seized at the time he was shot." (Pls.' Opp'n (dkt. #42) 37.) In making this argument, however, plaintiffs simply point to evidence that Dean intended to fire his service weapon, which although not in dispute, misses the thrust of the *County of Sacramento* line of cases. In particular, just as the defendants in *Bublitz intended* to use a tire-deflation

device, and the defendants in *Schaefer intended* to shoot their weapons, did not support a finding of a seizure of unintended targets, Dean's intent to shoot Logan did not work as a seizure of Erik. To the contrary, the undisputed record forecloses a finding that Dean intended to shoot and, therefore, seize Erik, any more than his own partner Leigh.

Similarly, plaintiffs fail to confront the Seventh Circuit cases cited by defendants, and instead cite to an Eleventh Circuit case, *Mercado v. City of Orlando*, 407 F.3d 1152 (11th Cir. 2005), in support. However, *Mercado* does not address whether a bystander who is unintentionally injured by police action can state a Fourth Amendment claim. Indeed, there was *no* dispute that a seizure occurred in that case: the officer intended to shoot the plaintiff. Instead, the court considered whether there was sufficient evidence to find excessive force in light of the defendant officer's position that he intended to shoot the plaintiff in the shoulder, which would not have been excessive, but instead shot him in the head, which, if intended, may be excessive. *Id.* at 1155. Given the standard at summary judgment, the *Mercado* court found that it "must assume" the officer "was aiming for [plaintiff's] head based on the evidence that [he] was trained to use the [less lethal munition], that the weapon accurately hits targets from distances up to five yards, and that [plaintiff] suffered injuries to his head." *Id.* at 1158. In contrast, plaintiffs here fail to put forth *any* evidence that would support a jury finding Deputy Dean *intended* to shoot Erik, whether in addition to, or instead of, Logan. For these reasons, the court will grant defendants' motion as to Erik's Fourteenth Amendment claim.[7]

---

[7] In granting summary judgment to defendants on this claim, the court is cognizant that it previously denied plaintiffs leave to amend to add a Fourteenth Amendment claim by Erik against defendant Dean. (2/24/21 Op. & Order (dkt. #28).) In denying that motion, the court pointed

### III. G.J.'s Fourteenth Amendment Claim

Logan's son G.J. asserts a claim for loss off society against defendant Dean. Defendants treat this claim as one arising under the Fourteenth Amendment, and plaintiffs appear to concede as much in their opposition, which describes G.J.'s claim as premised on the "constitutionally protected liberty interest that exists in the familial relationships of minor children." (Pls.' Opp'n (dkt. #42) 43.) Relying on *Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005), in which the court held that the Fourteenth Amendment does not provide a claim for loss of society for parents whose adult children were killed by police, defendants argue that G.J. lacks such a claim here as well. In the alternative, defendants contend that even if G.J. could state such a claim, his right to a loss of society claim was not clearly established at the time of the shooting, entitling Dean to qualified immunity.

Certainly, *Russ* could be distinguished, and as plaintiffs point out in their opposition, district courts within this circuit have recognized such a claim for minor children, like G.J. here, including in the Eastern and Western Districts of Wisconsin. (Pls.' Opp'n (dkt. #42) 43.) However, neither the Seventh Circuit, nor the Supreme Court has weighed in on this issue. In their opposition brief, plaintiffs themselves acknowledge, "the Seventh Circuit Court of Appeals has not expressly addressed whether a minor child has

---

out that plaintiffs had adequately alleged a seizure sufficient to state a Fourth Amendment claim. (*Id.* at 6.) While continuing to believe that denial of plaintiffs' motion to amend was proper -- both in light of the prejudice to defendants caused by such a late amendment, coupled with the fact that plaintiffs failed to allege that Dean had a "purpose to cause harm," an element of a Fourteenth Amendment claim (*id.* at 6) -- the court recognizes that it may seem unfair that Erik has no remedy for the injury caused by Dean at least under § 1983. However, the court is not ruling one way or the other as to the availability of any state law claims.

standing to bring a constitutional claim or 42 USC § 1983 claim for the loss of society and companionship of their parent." (*Id.* at 43.)

As described above, a qualified immunity defense has two prongs: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017) (quoting *Allin v. City of Springfield*, 845 F.3d 858, 862 (7th Cir. 2016)). Moreover, "courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Here, the court need not determine whether G.J.'s claim for loss of society under the Fourteenth Amendment makes out a constitutional violation as a matter of law, though that seems to be the trend in law. However, the court *must* recognize, as the parties did, that such a claim is not yet clearly established. Plaintiffs offered *no* response to this portion of defendants' motion, and as such, the court agrees that defendant Dean is entitled to qualified immunity on G.J.'s loss of society claim.

## IV. Availability of Punitive Damages

Finally, defendants seek summary judgment in their favor on plaintiffs' request for punitive damages. Specifically, defendants assert "[p]laintiffs cannot show that Deputy Dean was 'motivated by evil motive or intent' nor that he acted with 'reckless or callous indifference to [their] federally protected rights.'" (Defs.' Opening Br. (dkt. #36) 29 (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)).) For the reasons already discussed

however, a reasonable jury *could* conclude on this record that Dean did act with "reckless or callous indifference" by opting to fire his service weapon without an objectively reasonable basis to believe that he or another person was facing an imminent threat. Regardless, as is its typical practice, the court will deny defendants' motion for summary judgment, but will invite defendants to renew their request during the course of trial, once the court has had the benefit of reviewing all the evidence submitted by plaintiff during the liability phase.

## ORDER

IT IS ORDERED that:

1) Defendants Wood County and Nathan Dean's motion for summary judgment (dkt. #35) is GRANTED IN PART AND DENIED IN PART. The motion is granted dismissing (1) Wood County as a defendant, (2) plaintiff Erik Johnsrud's claim, and (3) plaintiff G.J.'s claim. At the close of this case, the clerk's office is directed to enter judgment in defendants' favor on these claims. In all other respects, the motion is denied.

2) The clerk's office is directed to terminate Wood County as a defendant.

Entered this 23rd day of June, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge